## GULF, COLORADO & SANTA FE RAILWAY COMPANY V. E. W. EDDINS.

### No. 768.

1. **Freight Contract.**—Horses were shipped at Coleman, Texas, for Winston, North Carolina. The receiving railway limited its liability to carriage to Fort Worth, Texas, and contracting to deliver the stock to some other line for transportation to Winston. In absence of contract the inference is, that the receiving carrier knew that the purpose of the shipper was to sell the horses at destination. In such case, the measure of damages for nondelivery of the horses is their value at Winston. The carrier could not by contract relieve itself from liability for any loss caused by its own negligence.

2. **Competency of Evidence of Value.**—Witnesses in charge of a drove of horses carried from Texas to North Carolina, and who knew the horses lost, and had sold horses in North Carolina and near Winston about the time the horses lost should have reached there, and had talked with citizens of Winston about the market value of horses, were competent to testify as to the value of the horses in controversy at Winston.

3. **Duty of Carrier to Deliver to Connecting Line.**—The carrier obliged to deliver freight to a connecting railway did not do so, but did deliver the car containing the freight to the Union Stock Yards, at the city of the transfer. *Held,* that the possession by the stock yard was that of the first carrier, which was liable until it should deliver or tender the freight to the connecting line. The duty of such delivery can not be transferred to another.

4. **Stock Escaping from Carrier.**—The carrier of live stock failing to deliver to a connecting railway can not be relieved from liability for the value at place of delivery by showing that the stock escaped. The stock yards captured two of the horses so shipped and proposed returning them to the shipper, charged with yard expenses. *Held,* that he was not bound to receive them; and such facts were no defense in suit for value.

5. **Harmless Error.**—A defense was alleged in answer, and was erroneously stricken out on demurrer. In progress of the trial it clearly appeared that the allegations so pleaded were negatived. *Held,* that the sustaining of the demurrer was error, but harmless.

6. **Stipulated Limitation—Notice of Claim.**—Chapter 17, Acts Twenty-second Legislature, page 20 (March 4, 1891), prohibiting contracts limiting time in which to sue, and prescribing that stipulations for notice of claim of loss for less time than ninety days shall be void, applies to interstate as well as to domestic contracts of shipment. Nor does the law interfere with or regulate interstate commerce.

7. **Reasonable Notice.**—State courts have exercised the power to enforce the rights of shippers to have reasonable time within which to make claim of loss, and have re-

fused to enforce stipulations in freight contracts held to be unreasonable. Such power may be exercised by the Legislature, as has been done in above act.

8. **Limitation**—The act prescribing minimum time for stipulated notice, etc., may be considered a statute of limitation, and as simply affecting the remedy and not attempting to effect the rights of parties, or to control or regulate in any manner interstate commerce. Such legislation by the States has been recognized as constitutional and valid by the Supreme Court of the United States. Cases discussed.

Appeal from County Court of Coleman. Tried below before Hon. H. A. Orr, County Judge.

This suit was instituted in the Justice Court, and judgment was rendered in favor of appellee for $195. Appeal was prosecuted by the appellant to the County Court. The case was tried in the County Court without a jury and judgment rendered for appellee for $125. Defendant appealed. Plaintiff's complaint in the County Court, on which the cause was tried, is as follows:

"The Gulf, Colorado & Santa Fe Railway Company, Dr., to E. W. Eddins, October 17, 1891. To the value of three mares, the property of E. W. Eddins, each of the value of $75, which said three mares said railroad company failed to deliver at Winston, N. C., in violation of its contract with E. W. Eddins, dated at Coleman, Texas, on October 15, 1891, which contract is attached to and made a part of this claim. Total value of said three mares, $225."

The live stock contract attached to the claim, in so far as stipulations are material to the errors assigned, is as follows:

"This agreement, made between the Gulf, Colorado & Santa Fe Railway Company, hereinafter called the company, and E. W. Eddins, hereinafter called the shipper, witnesses: That whereas the company transports live stock as per above rules and regulations, all of which are made a part of this contract; now, therefore, in consideration of the mutual covenants and conditions herein contained, the company agrees to transport for the shipper the live stock described below, and the parties in charge thereof, as hereinafter provided, viz: One car, said to contain twenty-five head of mares, from Coleman station, on the company's road, to Fort Worth station, on the company's road, and at said last named station to deliver the same to a carrier, whose line may be a part of the route to Winston, N. C., hereinafter called the place of destination, and on so delivering the same to said carrier, this contract shall be deemed fully performed by the company, and all liability of the company whatever for the carriage of or on account of said stock shall be thereby ended, it being distinctly understood that the company assumes no obligation whatever on account of the carriage of said stock beyond said last named station on its own road, and that the company shall not be liable for any damages to, injury of, or delay of said stock, or for anything whatever that may happen to the same after such delivery, or tender of delivery, in case such carrier shall

refuse to receive the same, and the shipper so expressly contracts and agrees.

"Ninth.  That for the consideration aforesaid, said shipper further agrees, that as a condition precedent to his right to recover any damages for any loss or injury to his said stock during the transportation thereof, or at any place or places where the same may be loaded or unloaded for any purpose on the company's road, or previous to loading thereof for shipment, he, they, or his or their agents in charge of the stock will give notice in writing of his claim therefor, specifying the nature of the claim to its station master, at said last named station on the company's road before said stock is removed from said station, and before the same shall have been removed, slaughtered, or intermingled with other stock, and will not move said stock from said station until the expiration of three hours after the giving of such notice, to the end that such claim may be fully and fairly investigated, and that a failure to fully comply with the terms of this clause shall be a complete bar to any recovery of any and all such damages."

The horses lost were part of a carload of twenty-five head.  At Fort Worth the car was sent to the Union Stock Yards, where the horses were fed.  In reloading three of the horses were lost, one killed, and two escaped.  The chute from the yards to the car was defective, from whence the loss.

. Witness Miller was in charge of the horses, and testified as to value: "I think I am acquainted with the market price of those horses at, in, or near Winston, N. C., at the time they should have arrived there. These stock were unloaded at Salisbury, N. C., by the railroad company to feed them.  I don't know when we should have arrived with the horses at Winston, N. C.  We were eight days from Fort Worth to Salisbury, N. C.  Salisbury is about 100 miles from Winston by railroad, and about thirty-five miles through the country.  I don't remember the date we took the horses off at Salisbury; we were some four or five days going through the country from Salisbury to Winston, N. C.  I never was at Winston before.  After I got to Winston I heard men speak about what such horses had been sold for before we got there.  I did not see any bought or sold at Winston, N. C.  We sold some near there after we got there.  All I know about the market value of such mares at Winston, N. C., is from the sales I made after we got up in that country, and what others told me they had been selling at prior to that time.  We sold several horses at Salisbury and in the country as we went from Salisbury to Winston."  Whereupon the plaintiff propounded to his witness Miller the following question, viz: "What were those three mares, that got away at Fort Worth, worth in the market at, in, or near Winston, N. C., at the time they should have arrived there?" and in response thereto the said witness (over the objection of the defendant) answered, "They were worth $75

each." To which question and answer defendant then and there objected, on the grounds: 1. Because the market value of said animals at, in, or near Winston, N. C., at the time they should have arrived at said Winston, N. C., is not the measure of damages in this case. 2. Because the witness Miller was not qualified or sufficiently informed to testify as to the market value of said animals at Winston, N. C., or as to the time they should have arrived there. 3. Because said testimony was incompetent, irrelevant, and immaterial.

Herndon, who had charge of another carload of horses shipped between same points, testified substantially as did Miller as to values.

It was proven that the horses were worth $15 each at Fort Worth. Two of the horses were captured and tendered to plaintiff by the stock yard people. This was rejected. The opinion gives other necessary facts.

*J. W. Terry*, for appellant.—1. It is submitted that the contract in this case covers all of the objections pointed out by the Supreme Court in the case of Railway v. Harris, 67 Texas, 166. It designates the officer on whom the notice is required to be served, namely the defendant's station master at Fort Worth, Texas. The contract requiring notice certainly appears to be reasonable on its face, and in the absence of any showing by the plaintiff of any facts that would make it unreasonable, it certainly should not have been stricken out on demurrer as unreasonable, as a matter of law. The contract relating to interstate commerce, the statute of the State prohibiting common carriers from limiting their liability was not applicable, and if applicable was void, because a regulation of interstate commerce. Railway v. Sherwood, 19 S. W. Rep., 455.

This shipment was interstate, although appellant's liability ceased at Fort Worth. The Daniel Ball, 10 Wall., 557; Cutting v. Railway and Navigation Co., 46 Fed. Rep., 641; Railway v. Pennsylvania, 136 U. S., 114.

In the absence of a statute, the Supreme Court of the State of Texas have held that the forty days limitation clause was binding. Railway v. Gatewood, 79 Texas, 89. The contract being made with reference to interstate transportation, it is submitted that the statute or Act of 1891, prohibiting a contract for a period of limitation for less than two years, is not applicable, and if applicable is void, because a regulation of interstate commerce, as Congress had already assumed the regulation of such commerce, and even in the absence of action from Congress its regulation was not within the power of the State. See cases above cited; also Railway v. Illinois, 118 U. S., 557; Railway v. Dismukes, 10 S. W. Rep., 289. Where Congress acts State action is superseded. Prigg v. Commonwealth, 16 Pet., 617; Mobile v. Kimball,

102 U. S., 691; Sherlock v. Alling, 93 U. S., 99; Hall v. De Cuir, 95 U. S., 485.

The State has not the power to regulate the rate of charge which a common carrier may make for that part of an interstate shipment within the State; on the same principle the State is without power to regulate the contract of carriage, or the terms and conditions under which the carrier will undertake such transportation, or to prohibit the carrier from inserting reasonable stipulations in the contract of carriage. Lafarier v. Railway (Me.), 24 Atl. Rep., 849; Dismukes' case, supra; Baird v. Railway (U. S. C. C.), 2 Am. and Eng. Ry. Cases, 281; Leisey v. Hardin, 135 U. S., 100, and authorities cited.

2. The proof and allegations in regard to a written instrument must correspond. A substantial variance certainly occurs where the plaintiff alleges a contract to deliver at Winston, N. C., and undertakes to prove one to Fort Worth, Texas. 2 Myer's Texas Dig., 1189.

3. The witnesses were not qualified to testify as to value. Railway v. Maddox, 75 Texas, 300.

4. Defendant's contract being for delivery of the horses at Fort Worth, Texas, the measure of damages was the value at that place. Hutch. on Carr., sec. 769.

*J. P. Ledbetter,* for appellee.

FISHER, CHIEF JUSTICE.—This is an appeal from a judgment of the County Court of Coleman County against the appellant for the sum of $125 for the value of three mares delivered to the appellant as a carrier by the appellee, under a contract of shipment from Coleman, Texas, to Winston, N. C.

The contract was entered into October 15, 1891, and the loss occurred a few days later. The contract stipulated that the appellant's liability as a carrier should cease upon the delivery of the stock to another line of railway at Fort Worth, Texas. One of the animals was injured and died when attempting to reload the stock from the Union Stock Pens, at Fort Worth, back into cars for shipment from that point to Winston, N. C. At the same time and place the two other mares escaped, and were not redelivered to the appellee.

It is contended by the appellant, that as the contract of carriage only obligates and requires the appellant to deliver the animals at Fort Worth, appellee's cause of action, if any, is confined to the failure to deliver at that place, and that the measure of damages, if any, is the value of the animals at Fort Worth, and not at Winston, N. C. And that the pleading and evidence of the contract to deliver at Winston is at variance with the contract as actually made and shown to exist, because from its terms the place of delivery agreed upon, so far as affects the appellant, was Fort Worth, and not Winston. These

points, in effect, are presented in appellant's first, third, sixth, and twelfth assignments of error.

The contract recites, that it was a shipment of the stock in controversy from Coleman, Texas, to Winston, N. C., but limits the liability of the appellant to carriage and transportation only to Fort Worth, Texas, and required it to there deliver or tender the stock to some other line of road for transportation to Winston.

In this connection no point is made by the appellant that, at the time the contract of shipment was made; it did not know that the stock was intended for sale in the market at Winston. But the inference to the contrary is reasonable.

Such being the case, we think the measure of damages may be determined by the market value of the animals at place of final destination.

Although there may be a stipulation in the contract limiting the liability of the carrier to its own line of road, a contract of shipment made under such circumstances contemplates that the market value of the animals shipped at the place of final destination is considered by the parties and enters into the contract as one of its elements. The carrier can not stipulate to relieve itself of that value when the damage and loss are traceable to its negligence. Railway v. Harris, 67 Texas, 168; Railway v. Maddox, 75 Texas, 300; Railway v. Fagan, 72 Texas, 129; Railway v. Greathouse, 82 Texas, 110, 111.

A reader of these cases will discover that this doctrine has been applied in cases of interstate shipment; such as the one before us.

The law holds the carrier to a diligent and careful transportation of its freight, and public policy forbids that it may throw off this obligation by stipulation for exemption from the consequences of its negligence. Such a contract would be unjust and unreasonable in the eye of the law, and will not be enforced in either a domestic or interstate shipment. 2 Am. and Eng. Encyc. of Law, 822; Railway v. Lockwood, 17 Wall., 357; Railway v. Wynne, 14 S. W. Rep., 312; Express Co. v. Donnell, 6 S. W. Rep., 766; Railway v. Garrett, 24 S. W. Rep., 354, and cases cited.

The value of the animals at Winston, N. C., was the value that the shipper was seeking and expecting to realize. The shipment was made for this purpose, which the circumstances show was known to the carrier. The carrier by its negligence brought about the condition that prevented the shipper from realizing this value, and an observance of the rules that give compensation for injury done should hold it liable for the market value at that place.

We think the evidence of witnesses Miller and Herndon, objected to in the fourth and fifth assignments of error, was admissible. The objections urged—except the first, which we have disposed of in dealing with the question just discussed—go more to the weight of the evi-

dence than to its admissibility. We think their evidence as to value was admissible.

In disposing of this assignment, we may as well dispose of the thirteenth assignment in connection with it, by saying that, in our opinion, the evidence of these two witnesses shows with sufficient certainty the value of the animals at Winston.

The appellant, in the eighth assignment of error, contends that it is not liable for the value of the animals, because at the time they were lost they were in the exclusive possession of the Union Stock Yards, with which the appellant was in nowise connected in a business way, and was not responsible for its acts.

The contract of shipment binds the appellant to carry safely to Fort Worth the animals in controversy and there deliver them to the connecting carrier, and exempts the appellant from its responsibility as carrier only when a delivery or tender of the shipment is made to the connecting carrier at Fort Worth.

There is evidence in the record that shows that the appellant, at the time the stock was lost and killed, had not complied with this stipulation, but had delivered the animals to the Union Stock Yards.

It had contracted to deliver to another carrier, and by force of this contract its liability as a carrier continued until this had been done. Its responsibility to this extent could not be destroyed by a delivery to the stock yards company. If, under these circumstances, it intrusted the possession of the animals to the stock yards, it became as much bound for their conduct as it would be for that of its own servants. The possession by the stock yards under these circumstances, so far as the shipper was concerned, was the possession of appellant.

The point contended for in the ninth assignment of error will have to be decided against the appellant. This court has before held, that the care and duty imposed upon the carrier to safely carry and care for the animals intrusted to its custody for shipment can not by contract be shifted to some one else so as to relieve the carrier from the consequences of its negligence; and especially is this so when it appears, as it does in this case, that the negligence of the servants of the carrier was the direct cause of the loss.

In disposing of the eleventh assignment or error, it is only necessary to say that the appellant was not only liable for the value of the mare killed, but the two that escaped from the keeping of appellant. The appellee was under no duty to recover these mares, but upon the contrary, if the appellant desired to escape liability for their value, it was required to place them, within a reasonable time, in the possession of appellee, or make a valid tender of them. This was not done. These animals were subsequently recovered and held by the stock yards company, which offered to surrender them to appellee upon the payment of certain charges for feed, etc. The appellee was not required to re-

ceive back the animals, burdened with this charge. The judgment, in the respect complained of, is not excessive. But we do not wish to be understood as holding that a redelivery of possession of the animals to appellee would have relieved the appellant from liability for their value at Winston. The effect of a redelivery under such circumstances we will not now decide, as it is unnecessary that it should be done in the case before us.

Appellant's second assignment of error is as follows: "The court erred in striking out all the special defenses pleaded by defendant in its original answer filed herein February 5, 1892, and in the Justice Court, January 25, 1892, upon plaintiff's general exception thereto, because said special defenses each state a good ground of defense to plaintiff's cause of action pleaded therein, in this: (1) The special defense pleaded of a contract upon plaintiff's part to give defendant notice of plaintiff's claim for damages, in writing, before removing stock from destination, was a valid and binding agreement. (2) The contract upon plaintiff's part to sue within forty days after injury received, as pleaded by defendant, was a valid and binding agreement. (3) The further special defense pleaded by defendant, that it only contracted to deliver the stock at Fort Worth, and within a reasonable time, and that it made such a delivery, was a valid agreement and a complete defense, if true, to plaintiff's cause of action."

The third special defense noted in this assignment of error, pleading a delivery to a connecting carrier at Fort Worth, Texas, presents, if true, a good defense under the contract of shipment, as it limited the liability of appellant to Fort Worth, Texas, when it made a delivery to its connecting carrier at that place. The contract pleaded stipulates, in effect, that the liability of the appellant as a carrier shall continue until it makes a delivery or tender of the shipment to the connecting line at Fort Worth. It was abstractly error for the trial court to sustain the demurrer to pleading presenting this defense, but under the facts of the case and the evidence coming not only from the appellee, but from the witnesses of appellant, it appears that this ruling, while technically erroneous, was harmless. The facts, without contradiction, show that these animals were not, before the loss, delivered by the appellant to any other connecting carrier, but were delivered to the Union Stock Yards Company. Under this state of facts, we do not think sustaining the demurrer should be held reversible error. The record shows that the defendant introduced evidence showing that it delivered the car in which the animals were confined, and in which they were shipped from Coleman, to the Union Stock Yards, and that the loss occurred while in the possession of the stock yards company. This is made plain, and stands without contradiction.

There was no error in sustaining the demurrers to the first and second special defenses pleaded, as stated in the assignment of error. At

the time the contract of shipment was executed and the loss occurred the Act of March 4, 1891, was in force.    This act reads:

"Be it enacted by the Legislature of the State of Texas:    Section 1. That it shall hereafter be unlawful for any person, firm, corporation, association, or combination of whatsoever kind to enter into any stipulation, contract, or agreement, by reason whereof the time in which to sue thereon is limited to a shorter period than two years.  And no stipulation, contract, or agreement for any such shorter limitation in which to sue, shall ever be valid in this State.

"Sec. 2.  No stipulation in any contract requiring notice to be given of any claim for damages as a condition precedent to the right to sue thereon shall ever be valid unless such stipulation is reasonable, and any such stipulation fixing the time within which such notice shall be given at a less period than ninety days shall be void, and when any such notice is required, the same may be given to the nearest or any other convenient local agent of the company requiring the same.    That in any suit brought under this act it shall be presumed that notice has been given, unless the want of notice is specially pleaded under oath."

It is contended by the appellant that, as the contract of shipment in this case is interstate, this act has no application, and, if applicable, is void as an attempt to regulate interstate commerce.

We think the act applies to interstate as well as domestic contracts of shipment, and if void as being a regulation and interference with interstate commerce, the answer presented good defenses if the facts should show that the stipulations pleaded were reasonable.    The question arises:    Does the act in question interfere with or regulate interstate commerce?  We think not.    Stipulations in contracts of interstate shipments limiting the time in which to sue and give notice have been, prior to this statute, permitted only when they were reasonable.  And the courts have denied the authority of the carrier to impose upon the shipper a contract limiting the time in which these things should be done, if from the facts of the case it appeared that the stipulation as to the time was unreasonable.    Railway v. Harris, 67 Texas, 168; Express Co. v. Donnell, 6 S. W. Rep., 766; Railway v. Garrett et al., 24 S. W. Rep., 354, and cases cited.

These authorities, with others that might be cited, demonstrate that the State courts interpose their remedial relief to the operation of unreasonable stipulations that the carrier by the terms of the contract of shipment seeks to impose upon the shipper.    The decisions, in effect, declare that the power lies in the State courts to determine and adjudicate the question whether the time limited in contracts of this character is reasonable or unreasonable; and that the exercise of this jurisdiction does not interfere with or regulate interstate commerce.

It can not be said that the matter of time is a question solely judicial in character, and about which for that reason a Legislature may

not act. But time, or the reasonableness of time, in which rights may be lost or acquired by reference to periods of limitation, is a matter that is not solely delegated to the courts, but may be and should be determined by the law-making branch of the State government. If the courts have the power to pass upon and determine that stipulations of interstate contracts of shipment as to time in which suits shall be brought and notice of loss given are reasonable or unreasonable, why may not the Legislature, when acting within the authority that authorizes it to create statutes of limitation that affect remedies, prescribe a time in which these things shall be done or not done? It seems to us that the Legislature is the proper body to exercise this function, and that these statutes should be treated as in the nature of statutes of limitation. Express Co. v. Caperton, 44 Ala., 103; 67 Texas, 168. If treated as a statute of limitation, it simply affects the remedy, and does not attempt to affect the rights of the parties or to control or regulate in any manner interstate commerce. It is the undoubted power of the State to pass laws prescribing periods of limitation in which remedies may be enforced, and to declare that limitation shall not within a certain time affect contracts that are made and entered into within its jurisdiction or sought to be enforced there. We can not perceive how legislation of this character could be said to in any manner affect interstate commerce. It does not impose any burden upon it. It does not regulate it, nor does it interfere with it. Railway v. Dwyer, 75 Texas, 578. The only effect it has is to prescribe a time in which the remedy shall be limited. The act is general in effect, and applies alike to all persons, either natural or artificial, that are capable of contracting. It does not single out commerce and undertake to regulate it or to impose restrictions upon it, but the broad purpose of the act is simply to prescribe a period of time in which contracts executed within this State shall not be affected by limitation. It prescribes a period of limitation that simply affects the remedy, and not the merits. 13 Am. and Eng. Encyc. of Law, 703–768.

The constitutionality of State statutes of limitation as affecting those provisions of the Federal Constitution that prohibit the States from passing any law which may impair the obligations of contracts or from taking property without due process of law, has frequently been passed upon by the Supreme Court of the United States, and the doctrine there established that such statutes are constitutional and in nowise affect the contract or property rights of the parties, but simply concern the remedy. 13 Am. and Eng. Encyc. of Law, 695–700.

These statutes of limitation resting upon the theory that they only affect the remedy and procedure, and not the merits or rights of the parties, are, in actions at law, enforced in controversies arising in the Federal courts. 13 Am. and Eng. Encyc. of Law, 772.

In Sherlock v. Alling, 93 United States, 99, it is said,. "that legislation of a State not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit." And it was held that a State statute giving a remedy to the personal representatives for damages resulting from the death of the relative against the carrier would be enforced.

In Smith v. Railway, 63 New Hampshire, 25, it is held, that a State law making a railroad liable for damages done by fire from its locomotives applies to railways engaged in interstate traffic, and is not a regulation of commerce.

The case of Johnson v. Elevator Company, 119 United States, 400, decides the question that a State statute of Illinois giving a lien upon vessels for damages occasioned by it will be enforced against the vessel, although it was engaged in interstate commerce. It was held in that case that the statute was not a regulation of commerce.

In Smith v. Alabama, 124 United States, 477 (cited with approval in Railway v. Alabama, 128 United States, 97), the court say:

"It is among these laws of the States, therefore, that we find provisions concerning the rights and duties of common carriers of persons and merchandise, whether by land or by water, and the means authorized by which injuries resulting from the failure properly to perform their obligations may be either prevented or redressed. A carrier exercising his calling within a particular State, although engaged in the business of interstate commerce, is answerable according to the laws of the State for acts of nonfeasance or misfeasance committed within its limits. If he fail to deliver goods to the proper consignee at the right time or place, he is liable in an action for damages under the laws of the State in its courts; or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another State, a right of action for the consequent damages is given by the local law. In neither case would it be a defense that the law giving the right to redress was void as being an unconstitutional regulation of commerce by the State. This, indeed, was the very point decided in Sherlock v. Alling, above cited. If it is competent for the State thus to administer justice according to its own laws for wrongs done and injuries suffered, when committed and inflicted by defendants while engaged in the business of interstate or foreign commerce, notwithstanding the power over those subjects conferred upon Congress by the Constitution, what is there to forbid the State, in the further exercise of the same jurisdiction, to prescribe the precautions and safeguards foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries which, after they have been inflicted, it is

admitted the State has power to redress and punish? If the State has power to secure to passengers conveyed by common carriers in their vehicles of transportation a right of action for the recovery of damages occasioned by the negligence of the carrier in not providing safe and suitable vehicles, or employes of sufficient skill and knowledge, or in not properly conducting and managing the act of transportation, why may not the State also impose, on behalf of the public, as additional means of prevention, penalties for the nonobservance of these precautions? Why may it not define and declare what particular things shall be done and observed by such a carrier in order to insure the safety of the persons and things he carries, or of the persons and property of others liable to be affected by them?"

In Railway v. Becker, 32 Federal Reporter, 849, it is held, that although an act may indirectly affect commerce, it may not regulate it, and will not be held void.

In Hart v. Railway, 69 Iowa, it is held, that a State statute that imposes limitations upon the power to contract by a carrier for the carriage of freight does not regulate commerce, and that such a statute is within the proper exercise of State legislative authority.

As bearing upon the question under discussion, the following cases may be read in addition to those quoted: Railway v. Dwyer, 75 Texas, 578; Rhea v. Railway, 50 Fed. Rep., 17; State v. Railway, 32 N. E. Rep., 817; Railroad Commission Cases, 116 U. S., 307; Harrigan v. Lumber Co., 129 Mass., 388; Silver Mining Co. v. New York, 143 U. S., 312; Ficklin v. Shelby County, 145 U. S., 19; Budd v. New York, 143 U. S., 528.

For judicial decisions determining this question, resting as it does on the Constitution of the United States, this court should look to those promulgated by the Supreme Court of the Nation. When we reach this field of investigation, we find that that court has, during the period of the judicial history of the question, occupied many and conflicting positions in dealing with it. But the three last cases cited, supra, which we regard as of the more recent expressions of that eminent court, seem to recognize the principle, that although State legislation may indirectly, incidentally, and remotely affect interstate commerce, it will not burden, regulate, and impede it, and unless it goes to this extent, it is not obnoxious to the Federal Constitution upon that subject. Many laws a State may pass that may incidentally affect interstate commerce, but will not control or regulate it, within the meaning of the commerce clause of the Constitution, and this authority exists whether such laws are the proper exercise of the police power of the State or not.

The case of Budd v. New York reaffirms the doctrine of the "Granger cases" in 94 United States, 113, 155, 164, 169, 180, 181, which were cited with approval in the "Commission cases," 116 United

States, 307. These cases decided that a State statute that in some degree affected the business of warehouses engaged in interstate commerce was a matter of domestic concern, and was not repugnant to the Constitution.

This ruling was subsequently shaken by the cases of Railway v. Illinois, 118 United States, 557; Robbins v. Shelby Taxing District, 120 United States, 489; and Leloup v. Mobile, 127 United States, 640; and these latter cases, we think, the court declined to follow to their full extent in deciding Budd v. New York, and Ficklin v. Shelby County.

We do not think the statute in question is a regulation of interstate commerce in the sense that would render it obnoxious to the "commerce clause" of the Constitution.

The judgment is affirmed.

*Affirmed.*

Delivered April 25, 1894.