## The Southern Pacific Railway Company et al. v. R. E. Maddox & Co.

### No. 2792.

1. **Receiver May be Sued.** — Exceptions were properly overruled questioning the right of the State court to entertain jurisdiction in a suit against a receiver of a railway company appointed and acting on order made by the United States court.

2. **Evidence—Res Gestæ.**—In a suit for value of mules killed in a railway collision it was competent for the plaintiff to show how the mules were killed, and that they were killed in a collision of the car in which they were with a passenger train, and that the engineer was drunk.

3. **Testimony to Value—Opinion.**—From necessity, opinions as to value are received in evidence; but in all cases, before the reception of such evidence, it should be made to appear that the witness is in possession of such information as will enable him to form an intelligent opinion.

4. **Same.**—See facts where witness was not in possession of facts upon which he could give opinion as to value. .

5. **Agreement as to Value.**—An agreement exacted by a railway company of a shipper, fixing a maximum of value for stock shipped, is against public policy if such agreement provides that in event of loss the shipper shall not recover the value of his property so lost by the negligence of the carrier.

6. **Same.**—An agreement as to the value of the thing shipped, made with a view to avoid controversy as to the actual value if it be lost in the hands of the carrier, it seems should be sustained.

7. **Authority of Agent.**—An agent of the owner of stock shipped would not, by virtue of such agency, be authorized to contract with the carrier fixing the value of the stock. See facts not showing power of agent.

8. **Agreements as to Value of Freight.**—The owner is not under obligation to make such agreement, nor is it necessary in order that the carrier may obtain reasonable freight for carrying the property.

9. **Liability of Common Carrier.**—The carrier's release from liability for loss of goods is determined by the common law; the facts not existing, a contract will not supply their absence. As to the compensation for loss, the carrier is bound to pay the full value of the property so lost; a contract otherwise would be against public policy.

10. **Value as Basis for Freight Charges.** — That the value of a thing to be carried may be properly taken into consideration by the carrier in fixing compensation to be paid is true; but when the carrier knows what the thing to be carried is, and from its nature what degree of care will be necessary to carry it safely, it seems that to permit the carrier to grade his care by his compensation contravenes the rule that denies the right of such public agent to contract against full liability for loss resulting from a failure to use at least ordinary care.

**11. Carrier's Duty.**—We understand the rule to be universal, except where some law exists which permits a common carrier to relieve himself by contract from liability resulting from his own negligence, that the carrier must, even where a valid contract limiting his liability exists, exercise such care as prudent persons would ordinarily use for the safety of the thing shipped.

**12. Contract Between Shipper and Carrier.**—The common carrier is entitled to an opportunity to fix compensation in view of the labor to be performed and the risk to be incurred in a given case, which must depend to some extent on the value of the freight and its qualities; but when this opportunity has been given, and the carrier receives the freight, any contract which relieves from liability for its full value if lost through the carrier's negligence is obnoxious to the objection that it is an attempt to relieve itself from its own negligence or that of its employes.

APPEAL from Tarrant. Tried below before Hon. R. J. Boykin, Special District Judge.

The opinion states the case.

*Finch & Thompson,* for appellants. — 1. A suit against a receiver of the United States court can not be maintained in another court, except it be subject to the general equity jurisdiction of the court in which such receiver was appointed, Sec. 3, Act March 3, 1887, 49th Cong. 2d sess., p. 552; Beach on Receivers; High on Receivers.

2. It is conceded that the measure of appellees' recovery, if anything, would be the fair market value of their mules at Los Angeles, the point of their destination, and in fixing this value only those witnesses should be allowed to testify who speak from their own knowledge; or at least when two witnesses have testified as to value, whose knowledge and credibility are not questioned, their testimony should control when controverted by only one witness, and that being the plaintiff, who spoke only from information obtained by hearsay during a three or four days flying trip to Los Angeles. Thurmond v. Trammell, 22 Texas, 257; Sayles' Civ. Stats., art. 2245, note p. 717; Whiteford v. Buckmyer, 39 Am. Dec., 640, note.

3. Upon an interstate shipment the local statutes do not apply; and where a contract with a carrier is fairly made agreeing on a valuation of the property carried, with the rate of freight based on the condition that carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible for the freight he receives, and of protecting himself against extravagant and fanciful valuations. Hart v. Railway, 112 U. S., 331–43; Newberger v. Howard, 6 Phil., 174; Squire v. Railway, 98 Mass., 239; Hopkins v. West, 6 Blatch., 64; Belger v. Dinsmore, 51 N. Y., 166; Openheimer v. Express Co., 69 Ill., 62; Maguire v. Dinsmore, 56 N. Y., 168; 72 N. Y., 35; 70 Ill., 410; Earnest v. Express Co., 1 Woods, 573; Elkins v. Transportation

Co., 81 Pa. St., 315; Railway v. Henlein, 52 Ala., 606; S. C., 56 Ala., 368; Muser v. Holland, 17 Blatch., 412; Harvey v. Railway, 74 Mo., 538; Graves v. Railway, 137 Mass., 33; Rev. Stats. U. S., 4281.

*Hunter, Stewart & Dunklin,* for appellees. — 1. A common carrier will not by any shipping contract be permitted to limit its liability to pay for property received by it for transportation to less than its market value when the property has been lost or destroyed in transit by the negligence of the carrier.

In Railway v. Harris, 67 Texas, 169, it is held that "a common carrier can not, by contract, relieve itself from liability for an injury resulting from the negligence of itself or servants." Railway v. Ivey, 71 Texas, 414; Railway v. McGown, 65 Texas, 643; Hutch. on Carr., secs. 249, 250, 260, 262, 263; Railway v. Lockwood, 17 Wall., 357.

Section 257, Hutch. on Carr., says: "Whenever the loss can be traced to his (the carrier's) negligence, the contract for limited liability will not avail him and will be considered out of the way." See also secs. 280, 294, 295, 748.

Grogan v. Adams Ex. Co., 60 Am. Rep., 360. In this case the Supreme Court of Pennsylvania refers to the case of Hart v. Railway, 112 U. S., 331, as having held that a common carrier may limit its liability and fix the amount to be recovered in case of loss, even though the loss was occasioned by its own negligence, and refuses to follow that decision upon the ground that it (the Supreme Court of Pennsylvania) had held in several cases previously the reverse of that doctrine. Railway v. Simpson, 30 Kan., 645; 3 Kan., 205; Black v. Goodrich Tr. Co., 55 Wis., 319; Westcott v. Fargo, 61 N. Y., 542; Laws. on Carr., sec. 50; 12 Am. and Eng. Ry. Cases, 13; 21 Id., 87, 98, 105; 60 Miss., 1003, 1017; U. S. Ex. Co. v. Blackman, 28 Ohio St., 144; Orndoff v. Adams Ex. Co., 3 Bush, 194; Kirby v. Adams Ex. Co., 2 Mo. App., 369; Railway v. Hopkins, 41 Ala., 486; Am. Ex. Co. v. Sands, 55 Pa. St., 141; Adams Ex. Co. v. Stetanus, 61 Ill., 184; Lamb v. Railway, 46 N. Y., 271; Judson v. Railway, 6 Allen, 486; Railway v. Ables, 60 Miss., 1017; Morrison v. Con. Co., 44 Wis., 405; 39 Miss., 822; 16 Am. and Eng. Ry. Cases, 158.

2. The market value of any commodity may be proven by any person who is conversant with the prices of such commodity at the time and place inquired about. And it is no objection that his knowledge of sales and prices was derived from inquiry in the trade. He need not be a resident of the place, and his evidence need not be based on actual sales. Abbot's Tr. Ev., 311; 2 Suth. on Dam., 375, 376.

STAYTON, CHIEF JUSTICE.—This action was brought by appellees to recover the value of mules shipped from Fort Worth, Texas, to Los Angeles, California, which were killed by the collision of trains after

they passed into the possession of the Southern Pacific Company. The action was brought against that company, John C. Brown, then receiver for the Texas & Pacific Railway Company, and against that corporation.

The Texas & Pacific Railway Company, it appearing from the petition that its railway was operated by the receiver appointed by a Circuit Court of the United States, questioned appellees' right to maintain the action against it, but its exceptions were overruled. On final trial, however, there was a judgment in its favor, and it therefore becomes unnecessary to consider questions affecting it.

The action was brought on November 7, 1887, and the injury occurred during September preceding. The receiver by exception questioned the right of the court below to entertain the action against him, on the ground that he could not be sued in any other court than that by which he was appointed. This defense was correctly overruled.

The petition alleged that both companies were railway corporations; that Brown was the receiver of the one, and that there was an agreement between the defendants that the Southern Pacific Company would receive from the other and the receiver all goods, live stock, and other merchandise transported over the Texas & Pacific Railway from Fort Worth, Texas, at El Paso, Texas, and transport the same to Los Angeles, California, at a fixed rate per car load agreed upon, the money received for such service to be divided between them.

It further alleges that all the defendants received the mules at Fort Worth, Texas, and agreed to transport them to Los Angeles, California, for which plaintiffs agreed to pay the sum of two hundred and ten dollars, the customary price, but that the defendants failed to comply with their contract, and that through the negligence of defendants and their employes the mules were killed by the collision of trains.

The petition did not allege that the contract was in writing.

The receiver alleged that the shipment was not a through shipment, and that if so originally intended it was rescinded by a contract made at El Paso between the plaintiff and the Southern Pacific Company, whereby his contract terminated, the shipper receiving the mules and delivering them to the Southern Pacific Company, from whom plaintiff received another shipping contract, under which the mules were lost.

He further pleaded that the mules were received by him at Fort Worth and shipped under a special written contract, by the terms of which plaintiff agreed not to claim over one hundred dollars per head for the mules in the event they were lost or damaged; that it was agreed this should be the full extent of his liability, and that the consideration for this contract was a reduction in rate of freight given to plaintiffs.

The contract was made an exhibit to the answer, and contained many provisions not now necessary to mention, some of which are such as a

common carrier can not enforce to relieve himself from liability in case of loss.

The shipping contract executed at Fort Worth was a through contract binding the carrier to transport the mules from that place to Los Angeles, California, and contained the following provisions: "The said Pacific Railway Company, as aforesaid, will not assume any liability over the actual value, but in no case exceeding one hundred dollars per head on horses and valuable live stock, except by special agreement." This is contained in what is styled "Rules and Regulations for the Transportation of Live Stock," made a part of the contract, which also contains the further provision that "the said second party further agrees, for the consideration aforesaid, that in case of total loss of any of his said stock from any cause from which the said party will be liable, to pay for the same the actual cash value at the time and place of shipment, but in no case to exceed one hundred dollars per head, which shall be taken and deemed as full compensation therefor, and in case of injury or partial loss the amount of damage claimed shall not exceed the same proportion."

The Southern Pacific Company denied that the contract made at Fort Worth was a through contract, and claimed that it received the mules at El Paso under a contract there made between itself and the plaintiff, but admitted that the mules were killed while in transit on its road between El Paso and Los Angeles.

It further pleaded that under the contract made with it appellee agreed in case of loss of the mules he would not claim more than sixty-five dollars per head for them, which was the full amount of liability to be assumed by it; but it also set up the contract made at Fort Worth, and under that claimed exemption from liability for more than one hundred dollars per head.

The contract made at El Paso was made an exhibit to the answer, and contained the following provision: "And the said party of the second part agrees that in case any injury to or loss of such stock shall occur, for which the said Southern Pacific Company is legally liable, that the amount to be by him claimed for each animal so lost or injured shall not exceed the sum of sixty-five dollars."

This contract was signed by the agent of the company but not by the shippers or any one for them, but the name of the employe of appellees, who was traveling with the stock, seems to have been signed to the paper, probably for the purpose of identifying him as the person entitled to passage in charge of the stock.

Appellees denied under oath the execution of the contract alleged to have been made at El Paso, and there was no evidence to show that it was executed by them or any one acting under their authority; but the person who was traveling in charge of the mules seems to admit that he signed it, but states that he did it without authority, after being told by

the agent of the company that he had to do so in order to ship the mules through and get a pass for himself.

On the trial a witness stated that the mules were killed in a collision of the car in which they were with a passenger train, and that the engineer was drunk.

It is urged that the admission of this evidence was improper, but it was surely competent to prove the destruction of the mules, and there was no impropriety in showing how they were killed.

Evidence tending to show that the agent traveling in charge of the mules had no authority to execute the contract made at El Paso was admissible under the same plea; and as the contract executed at Fort Worth entitled appellees, at least against the receiver, to through transportation of the mules, all of which was known to the agent of the Southern Pacific Company, there can be no claim that the company relied on the fact that the employe was in possession of the mules as sufficient evidence of his authority to make the contract.

As will hereafter be seen, it is unimportant, however, in so far as the question of liability of the receiver or the Southern Pacific Company is concerned, whether the employe had or had not authority to execute the contract claimed to have been made at El Paso.

One of appellees was permitted to testify as to the value of such mules at Los Angeles about the time they were killed; and this evidence was objected to on the ground that the contracts cut off the right to prove a higher value than the maximum named in the contracts, and because the evidence was hearsay.   The witness seems to have had no personal knowledge of the value of such mules at Los Angeles, but was permitted to state what persons there told him such mules as he described those killed to have been were worth.

In proving value it often becomes necessary to receive the opinion of witnesses, but in such cases it should appear that the witnesses have had opportunity to form correct opinions.   The witness saw no mules sold in the Los Angeles market, heard no offer made for any, and only knew what prices persons told him had been paid for some mules he saw, what prices were asked for others—in fact had no information as to the value of mules in that market other than such as he derived from statements made by others.   He only remained in Los Angeles a few days, and did not pretend to base his opinion on knowledge actually acquired through observation of the market, but upon statements made to him by others.

His estimate, as well as the finding of the jury, was higher than the valuation placed on such mules by persons, in the course of business, having opportunity to form a correct opinion as to value.

From the necessity of cases arising opinions as to value are received, but in all cases before the reception of such evidence it should be made

to appear that the witness is in possession of such information as will enable him to form an intelligent opinion.

We think his evidence, resting as it did on hearsay, not public in its nature and therefore entitled to credit, and consisting largely of what persons told him, should have been excluded; and as his evidence alone is all on which the verdict can stand, its admission furnishes ground for reversal, and especially so when a motion for a new trial based on the admission of this evidence and an excessive verdict was overruled.

It is urged that the court erred in admitting evidence to show that the mules were worth more than the maximum value fixed in the contracts pleaded, and that the court erred in refusing to charge the jury that the contracts were binding in so far as they stipulated for a maximum valuation.

The court instructed the jury as follows: "If you further believe from the evidence that while said mules were in the possession of the Southern Pacific Company they were killed by a collision of the trains of said defendant, caused by reason of the drunkenness or negligence of the employes of said defendant, or any of them, then you will find for the plaintiffs against the defendants John C. Brown, receiver of the Texas & Pacific Railway Company, and the Southern Pacific Railway Company, the market value of said mules at Los Angeles, California, at the time they should have been delivered there, with eight per cent interest on said amount from the date they should have been so delivered up to the present time, less two hundred and ten dollars, the freight agreed to be paid."

The court refused all instructions which declared those parts of the contracts valid which placed a limit on the valuation of the mules in case of their loss through the negligence of either of the carriers.

There is great conflict of authority as to whether such contracts will protect the carrier against liability for the actual value of property to which they apply, if this be lost or injured through the negligence of the carrier, and many cases are cited in the briefs of counsel in support of the different rules.

It would seem reasonable where the parties have actually negotiated and come to an agreement as to the value of a thing shipped, with a view to avoid controversy as to the actual value if it be lost while in the hands of the carrier, that such an agreement should be sustained; for the parties before loss may as well by agreement fix value while each has equal means of doing so, as by proof to be made after a loss occurs; and such an agreement would not operate as a limitation on the liability of the carrier, for the valuation actually agreed upon ought to be deemed, in such cases, the actual value.

In such case, however, it may be doubted if an agent empowered to ship ought to be held to have power to fix value, unless authorized to do so by the owner; and no wrong would be done to the carrier by so hold-

ing in any case where the thing to be shipped is open to the inspection of the carrier, or though boxed or otherwise enclosed is one of ordinary commerce whose value could be ascertained by inquiry, for in such cases the carrier may for himself determine the value and regulate his charges thereby. It ought not to be presumed that a shipping agent had power to make a contract other than the carrier may lawfully require.

There is no obligation resting on the owner to make an agreement as to value, and the carrier may secure to himself a reasonable freight by determining that for himself.

If there be a concealment of the thing to be carried or of its value by an agent, the owner is as fully responsible therefor as though the act were his own, and the same results would follow.

In the case before us the owners had fixed the price at which the mules were to be transported, which was determined by the car load without inquiry as to the value of the mules; but when they were afterwards shipped by the agent he signed the contract before us without authority to fix a valuation, unless such an authority is to be implied in every case of shipment by an agent. Ought such authority to be implied under the facts?

The contracts before us, however, are not contracts in which an agent assumed the power to make an agreement as to the value of the mules, and we do not propose to dispose of the case on the ground that he could not have made such a contract, nor upon the ground that he had no power to make the contracts in question.

The contracts provided that the carriers should not be liable for a greater sum per head than therein stated, though the real value might, as was shown to be the case, be more than the highest sum named.

In the absence of some law which authorizes a common carrier to relieve itself by contract from liability resulting from the negligence of itself or employes, it is well settled that this can not be done.

That the liability made the basis of this action resulted from the negligence of the employes of the Southern Pacific Company can not be questioned under the facts proved.

The next inquiry is, do the contracts in question, if given effect, operate as a limitation on the liability of the carriers?

The liability of a common carrier is twofold in its nature, and involves, when brought in question, two inquiries:

1. Do facts exist which impose upon the carrier an obligation to make compensation for an injury to or loss of freight while in his possession as carrier?

The common law determines what facts will relieve a common carrier from liability, and in the absence of these facts, no other law regulating the matter, the carrier is held responsible or liable for loss or injury to goods while in his hands, and any contract which declares the carrier not

responsible when that state of facts exists which fixes responsibility under the law, is a contract limiting the carrier's liability.

2.   The liability or responsibility of the carrier has relation to the extent to which he is under obligation to make compensation for loss or injury to goods, as well as to the mere existence of obligation.

The common law and all other laws require the carrier to pay the full value of property lost or destroyed while in its possession, if lost or destroyed under circumstances which impose obligation, and a contract which provides that the carrier shall be freed from obligation on payment of a sum less than the value of the thing lost or destroyed is as much a limitation on the carrier's liability as is a contract that the carrier shall not be responsible for a loss resulting from a cause not sufficient under the law to relieve it from obligation; but the reasons, founded as they are on public policy, for fixing obligation on the carrier under a given state of facts do not apply with their entire force when applied to the extent to which compensation shall be made.

If there be fraud or imposition in misrepresenting the nature or value of the thing to be carried, the shipper ought to be held to forfeit his right to indemnity in case the carrier is thereby induced to bestow less care in its transportation than he would had he been advised of its true nature and value; but when no misrepresentation is made or concealment practiced, and the carrier has means as ample as the shipper to ascertain its nature and value, and therefore to properly estimate the risk, can it be held that the carrier is misled as to any fact which ought to influence his conduct, lull his vigilance, or shield him from full resposibility for his own failure to use due care?

The cases which hold that the carrier may relieve itself from full responsibility for injury resulting from negligence, by contract stipulating that in case of loss a sum less than the true value shall be the maximum of liability, so hold on the ground that the carrier is thus induced to fix a rate of freight lower than would otherwise have been done, and that to permit the shipper to recover the actual value would be unjust to the carrier.

We have the very highest respect for the opinions of the courts that so hold, but it seems to us, in cases in which there is no misrepresentation or concealment, in which the carrier has ample opportunity to see and know the nature and value of the thing to be carried, that the reason for such a rule is not sufficient.

It makes the degree of care requisite to depend, not on the nature of the thing to be carried—which ought to be the test of degree of care to be used by all persons or corporations pursuing the business of common carriers, even where a lawful contract limiting liability exists—but on the amount of compensation to be paid.

That the value of a thing to be carried may be properly taken into

consideration by the carrier in fixing compensation to be paid is true, but when the carrier knows what the thing to be carried is, and from its nature what degree of care will be necessary to carry it safely, it seems to us that to permit the carrier to grade his care by his compensation contravenes the wholesome rule which denies the right of such a public agent to contract against full liability for a loss resulting from a failure to use at least ordinary care.

It has, in effect, been said that such contracts do not induce a want of care, but exact from the carrier the measure of care due to the value agreed on.   But would it not be a very dangerous rule which permits care to be measured by value?

It would lead to a holding that the carrier owes but a slight degree of care when the thing to be carried is of small value intrinsically or by an agreed valuation, and the rule would be as fluctuating as are the values of things carried.

We understand the rule to be universal, except where some law exists which permits a common carrier to relieve himself by contract from liability resulting from his own negligence, that the carrier must, even when a valid contract limiting liability exists, exercise such care as prudent persons would ordinarily use for the safety of the thing shipped, looking to the nature of that.

A different rule would make the measure of care required to depend on the adequacy of the sum paid for transportation, this to be determined by the value of the thing to be carried, which can not be a correct rule unless it be true that the degree of care to be used by a common carrier is to be measured by the compensation to be paid.

We do not understand that such a rule ever has been or ever ought to be established.

Followed to its legitimate result such a rule would require the holding that a carrier by agreeing to gratuitously transport freight might by contract relieve itself from any liability whatever, and from obligation to exercise even the slightest care.

In the case even of a gratuitous mandatory, not charged with any public duty, we understand such a rule to have been denied ever since the case of Coggs v. Bernard.

It seems to us that such contracts do induce a want of care, for the highest incentive to the exercise of due care rests in a conciousness that a failure in this respect will fix liability to make full compensation for any injury resulting from that cause; and if the meaning which we attach to the words "liability" and "exemption" be correct the tendency of such contracts is to exempt for negligence.

The common carrier is entitled to an opportunity to fix compensation, in view of the labor to be performed and the risk to be incurred in a given case, which must depend to some extent on the value of the thing

to be carried and its intrinsic qualities; but when this opportunity has been given and the carrier receives the freight, any contract which relieves from liability for its full value, if lost through the carrier's negligence, in our opinion violates the wholesome rule so long and well established in other cases in which the carrier attempts by contract to relieve itself from liability for the negligence of itself or employes.

In view of the intrinsic justice of such a rule, its easy and certain application, its avoidance of all necessity for inquiry whether a contract be fairly and understandingly made, or made under the influence of the unequal position the great carriers of the present time have and may too frequently exert, and in view of the conflict of authority, we feel constrained to hold that a common carrier can not shield itself from responsibility for the full value of property lost through its negligence by such contracts as are before us in this case.

This view of the case leads to the holding that appellees are entitled by any proper evidence to prove what the actual value of the mules was, and thus to recover in accordance with the charge given, and further renders it unnecessary to consider whether from the entire contracts and regulations with reference to which they were made, it does not appear that no real consideration existed to support them, if they were otherwise valid.

No question is raised as to the liability of the receiver under the contract for a loss occurring after the mules passed into the possession of the Southern Pacific Company.

For the error noticed the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Delivered December 3, 1889.