### GULF, C. & S. F. RY. CO. v. COULTER.

(Court of Civil Appeals of Texas. Texarkana. June 8, 1911. Rehearing Denied June 29, 1911.)

1. APPEAL AND ERROR (§ 1002\*)—VERDICT—WEIGHT OF EVIDENCE—REVIEW.

A judgment will not be reversed because of the unreliability of plaintiff's evidence appearing on its face, where it cannot be said as a matter of law that the alleged impeaching conflicts therein were such that the jury were not warranted in accepting his statement as true.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. § 1002.\*]

2. TRIAL (§ 252\*)—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.

Where a buyer of goods refused to accept them solely because of their damaged condition on arrival, and agreed to receive them provided they could be put in proper condition within a specified time, an instruction authorizing a recovery against the carrier for loss of the sale, in case the jury found that the sale was lost because the goods were misrouted, was erroneous as inapplicable to the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 596–612; Dec. Dig. § 252.\*]

3. CARRIERS (§ 135\*)—INJURIES TO GOODS—MEASURE OF DAMAGES—CONTRACT OF SALE—LOSS.

Where the owner of goods shipped had sold the same for part cash and part credit, and lost the sale by the goods having been damaged in transit, his measure of damage was the difference between the value of the goods in their damaged condition at the time they reached destination and the present value of his contract with the buyer.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 603½; Dec. Dig. § 135.\*]

4. DAMAGES (§ 163\*)—INJURIES TO GOODS—BURDEN OF PROOF.

Where plaintiff, by reason of the delivery of goods by a carrier in bad order, lost a contract to sell the goods for part cash and part credit, the burden was on him to show the present value of the credit portion of the contract by proving the buyer's solvency and whether interest was to be paid on the deferred payments, and, if so, at what rate, under the rule that where plaintiff seeks to recover damages sustained by the loss of a market, the burden is on him to allege the value of the market lost.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 454–459; Dec. Dig. § 163.\*]

5. DAMAGES (§ 163\*)—INJURY TO GOODS—LOSS OF MARKET—VALUE OF CONTRACT—PRESUMPTIONS.

Where plaintiff claimed to have lost a sale of goods for part cash and part credit because of their having been delivered in bad order, it could not be presumed, in the absence of proof, that the notes to be executed by the buyer for the deferred payments were to bear interest at at least 6 per cent. per annum from date, that they would be secured by a lien on the goods, and would be prima facie worth their face.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 454–459; Dec. Dig. § 163.\*]

6. TRIAL (§ 191\*)—INSTRUCTIONS—ASSUMING FACTS.

Where an owner of goods claimed to have lost a sale thereof by reason of their having been delivered by defendant carrier in bad order, and, after keeping the goods a year, sold them in their damaged condition for $1,200, an instruction directing the jury to deduct from the value of the contract of sale the amount so received for the goods when sold was erroneous as assuming that $1,200 was the value of the goods when delivered by the carrier at destination, the measure of damages being the difference between the value of the goods in their damaged condition at that time, and not when they were sold, and the value in cash of the lost sale.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 420–431; Dec. Dig. § 191.\*]

---

\*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**7. EVIDENCE (§ 317*)—HEARSAY—CONVERSATIONS WITH THIRD PERSON.**

In an action against a carrier for loss of a contract for the sale of goods due to their being delivered in a damaged condition, it was improper to permit plaintiff to reproduce statements made to him by the prospective purchaser regarding the damaged condition of the goods, or conversations other than those essential to show the consummation of the contract of sale and the purchaser's rejection of the goods after delivery at destination.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1174–1192; Dec. Dig. § 317.*]

**8. EVIDENCE (§ 105*) — RELEVANCY — STATEMENTS BY THIRD PERSON.**

In an action against a carrier for misrouting and delivering goods in a damaged condition, statements made by third persons to plaintiff involving criticisms on the condition of the goods and with reference to the manner in which they were routed were irrelevant and immaterial.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 169–176; Dec. Dig. § 105.*]

**9. EVIDENCE (§ 474*)—VALUE—WITNESSES—COMPETENCY.**

An owner of billiard tables and fixtures was incompetent to testify as to the value thereof when new and in an uninjured condition, where his sole information was obtained from a salesman handling such goods.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2218; Dec. Dig. § 474.*]

Error from District Court, Tarrant County; Jas. W. Swayne, Judge.

Action by H. W. Coulter against the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

Terry, Cavin & Mills and Lee & Lomax, for plaintiff in error. Hunter & Hunter, for defendant in error.

HODGES, J. In March, 1908, the defendant in error, H. W. Coulter, instituted this suit against the plaintiff in error to recover damages for injuries to a shipment of billiard tables and fixtures while being transported from Ft. Worth to Philadelphia. In substance, the petition alleges that at the time the goods were delivered for transportation the plaintiff expressly directed that they be routed via St. Louis over the Vandalia line of railroad through Indianapolis, and on to Philadelphia, to which routing the defendant agreed; that it was further agreed that the goods were to be shipped in one large car 50 feet long, for which the freight charges were to be $230, but that defendant, without plaintiff's consent and over his objection, placed them in two smaller cars; that, in order to obviate plaintiff's objection, the defendant agreed that the two cars should both go at the same rate of freight as the one large car which it had agreed to furnish; that the freight charges were tendered in advance, but refused on the ground that it was customary to collect them at destination. The value of the goods was placed at $10,000 at Ft. Worth and Philadel-

phia. It was also averred that the defendant failed to route the goods via St. Louis over the Vandalia line, but sent them over the Atchison, Topeka & Santa Fé Railway, it being under the same ownership, management, and control, and at Chicago delivered them to the Pennsylvania Railway, which, in turn, delivered them to the Philadelphia & Reading Railway, by which company they were delivered at Philadelphia June 26, 1907, being en route since May 2d. It is alleged that plaintiff went from Indianapolis and from there to Philadelphia, and, being unable to locate his goods, spent the sum of $300 in telegraphing and traveling in his efforts to find them; that, when they were tendered to him at Philadelphia, he at first refused to receive them and pay the freight bill of $549.69 charged against them, but later, and without knowing the condition of the goods, paid the freight charges and took possession of his property; that upon inspection he found that the goods had been greatly damaged, rendering them almost worthless; that after having received them he was compelled to store them at a cost of $24 per month. The petition also avers a tender of the goods back to the defendant, and concludes with a prayer for damages in the sum of $20,000. By an amendment to the original petition, filed November 8, 1909, plaintiff added the following averments: That he had conditionally sold the goods to Grant H. Eby for $7,000, who had arranged to set them up in Detroit, and had by letter requested the plaintiff to route them via St. Louis over the Vandalia line to Indianapolis, at which last-named city plaintiff was to have the right to divert the goods to Detroit; that of this sale defendant was fully informed at Ft. Worth before and at the time it received the goods and issued the bill of lading; that at the time the defendant received the goods for shipment and after the written receipt, or bill, was issued, and Eby's letter was shown to defendant and its shipping agents at Ft. Worth, it was distinctly understood and agreed that the goods should be shipped and routed as requested; that after opening the goods at Philadelphia he offered them to Eby, to whom they had been sold for $7,000 upon condition that they were delivered in as good condition as when shipped from Ft. Worth, proposing to Eby that he (plaintiff) would reship them to Indianapolis or Detroit as Eby might request, but that upon examining the goods Eby pronounced them worthless and refused to accept them at any price; that on arrival of the goods at Philadelphia they were not worth over $1,200 on account of their injured condition, and plaintiff was compelled to sell them for that sum after paying $300 storage bills. The defendant answered by general denial and other special pleas not necessary here to notice. A verdict was returned in favor

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

of the plaintiff for the sum of $5,800, with interest thereon at the rate of 6 per cent. per annum from June 27, 1907, upon which verdict the court entered a judgment in favor of the plaintiff for $6,760.

From portions of the testimony which is not disputed it appears that Coulter had formerly lived in Philadelphia, and some time during the year 1905 he was induced by one L. J. Gouffe, who was at that time residing at Ft. Worth and engaged in running a billiard hall, to come to Texas and take charge of his (Gouffe's) business. Coulter came, and afterwards married Gouffe's daughter, and in the course of time acquired ownership of the property in controversy. In 1907, as he testified, on account of some Texas legislation which injuriously affected his business, he determined to leave Ft. Worth and move to another state. Grant H. Eby was an expert billiard player, and during the time that Coulter had charge of the billiard hall at Ft. Worth came to that place and gave some exhibitions of his skill. Some of those performances took place at Coulter's hall, and in this way the two became acquainted. Negotiations were opened between them for the sale and purchase of the billiard property owned by Coulter. According to Coulter's testimony, before shipping the goods, as alleged in the petition, he received the two following letters from Eby:

"New York City, April 7th, 1907. Mr. H. W. Coulter, Fort Worth, Texas—Dear Persey: Arrived in New York yesterday, the 6th, from New Orleans. I had hoped to stay in New Orleans for a long time, but Mrs. Eby not being well, I thought it best to get home. Am now in a position to do business with you. Your goods as I saw them last month surprised me. You certainly know how to take care of your tables. I am not trying to hand you hot air, but speaking frankly, from my experience around the country, you are an exception to the rule. As I have to settle down and quit this running around the country for Mrs. Eby's sake, I will take your proposition, but the best that I can absolutely do is $7,000, goods delivered to me at destination; this means you pay the freightage; of course, you know I am not a millionaire; make it in the neighborhood of $3,000, the notes to be as low as you can make them. Would suggest that you have a suitable contract drawn up by some good attorney, and I will see to it being properly executed at this end. Give me instructions how you wish the cash transferred, who are your bankers, and with what bank do they do business here. Now as to my location, Detroit is a crackerjack city, and I made a big hit when I was there last. In all probability Detroit will be my choice. Of course I have to be governed by my ability to find a suitable location there. Indianapolis is just getting the fever, so if I cannot get what I want in Detroit, I no doubt will in Indianapolis. If I do not succeed

in Indianapolis, I will do so somewhere in the vicinity. In a few days I will leave here for Detroit, as the new hotel there is open, and it might possibly be that I can get this opening. Remember me to the family. Your friend, Grant H. Eby."

"Detroit, April 24th, 1907. Mr. W. H. Coulter, Fort Worth, Texas—Friend Persey: Yours enclosing contract at hand. The tone and general run of the things make me believe you have changed your mind about selling. If this is the case, do not have any hesitancy about telling me. You know, Perc, I told you in my last letter that as yet I was not a millionaire, and to be moderate with your cash price. You know I have to live while I am making good, as I only have a small amount of capital, so it makes it absolutely impossible for me to meet your demand of $4,000. Pardon me for being so frank, but by the talk you gave me at Fort Worth, I took it you wanted to treat me liberally. The face of those notes, reading $200, is really a joke. You know, old fellow, as well as I do, that I could not possibly pay that sum every thirty days out of the receipts of a place just new opened. There is only one way you and I can straighten this thing out, and that is for us to get together personally. I haven't any doubts whatever that you will see it my way; in fact, my whole confidence is based on your so doing, and then, too, I know you want me to have the goods. Pers, $3,000 is all that I can do, and the notes should not read more than $75.00, but we will leave the matter rest until we can see each other. I have succeeded in picking out a place here in Detroit, but it will not be vacant until some time in August. The fellow promised to fix it up nicely for me, should I take it, giving me first option on it. In the exhibition given here last night I filled the hall, as usual. When you ship the goods, do so by the Vandalia R. R. from St. Louis to Indianapolis, only paying the freightage that far, as I would like to look Indianapolis over before deciding upon Detroit. Be sure of the crating; have the Brunswick-Balk Co. do it. Write me immediately upon receipt of this in care of the Brunswick-Balk, Chicago, as I will leave Chicago for New York about the first. Expecting your favorable reply. Your friend, Grant H. Eby."

Coulter further testified that, before tendering the goods for shipment, he had one or more conversations with plaintiff in error's agents at Ft. Worth regarding the routing and the freight rate that would be charged; that during one or more of those conferences he exhibited to the plaintiff in error's agents the two letters above quoted, and stated to them that his purpose in sending the goods was to carry out that contract of sale. He also testified that it was distinctly agreed between him and the plaintiff in error's agents that the goods would go via St. Louis over the Vandalia line, and that he

would have the option of stopping them at Indianapolis with the privilege of diverting to another point if he so desired. As to the facts last mentioned, those relating to the conversations and agreements between Coulter and the plaintiff in error's agents, Coulter is contradicted by the latter. They testified that no such letters were ever exhibited to them, and that there was no request for the goods to be routed via St. Louis over the Vandalia line, that the goods were consigned to Philadelphia, and they had no instructions as to the routing of the shipment. Coulter further testified that, after the goods were shipped, he, together with his wife and her mother, left Ft. Worth for Philadelphia; that he met Eby at St. Louis, from which place they traveled together to Philadelphia; that during their journey he and Eby completed their negotiations with reference to the terms upon which the goods were to be sold to Eby; that those terms were $3,000 in cash and $4,000 to be paid in monthly installments of $75, for which deferred payments Eby agreed to execute his notes. Nothing appears to have been then decided as to what, if any, rate of interest those notes were to bear, or whether or not any security was to be given therefor. Coulter also testified that he informed Eby at that time that the goods had been shipped to Philadelphia; that upon Eby's inquiring why this had been done Coulter told him that it was at the instance of Mr. Gouffe, who expressed some doubt as to Eby's willingness to receive the goods and carry out his contract of purchase, and suggested that they be billed through to Philadelphia, and that, if Eby did meet his obligation to complete the purchase, they might be stopped en route at Indianapolis, and from there diverted to whatever point Eby might desire to carry them. After his arrival at Philadelphia, Coulter gave directions to the agent of the Vandalia line at that place that his goods be stopped at Indianapolis. This agent, however, it appears, after some effort, was unable to locate them. On June 26th the goods reached Philadelphia over the Pennsylvania & Reading Railway, having been routed by the plaintiff in error's agent at Ft. Worth over the line Atchison, Topeka & Santa Fé Railway as mentioned in the plaintiff's petition, instead of that which he testifies had been agreed upon. After some further delay occasioned by disagreement as to the freight charges, which Coulter claims were excessive, the goods were unloaded and stored. According to his testimony and that of his witnesses, they were considerably damaged; but, according to the testimony of witnesses who testified for the plaintiff in error, the damages were insignificant, and probably due to improper crating or loading. Coulter and Eby both testified that the latter afterwards visited Philadelphia and inspected the goods, but declined to receive them on account of their damaged condition; that he finally consented to take them, provided they could be repaired and put in as good condition as they were when shipped, if this could be done by the 1st of August following. Coulter testified that upon inquiry he found this to be impracticable, and the trade with Eby was abandoned.

[1] The first error to which attention is called is the sufficiency of the evidence to sustain the judgment. This assignment is predicated upon the assumption that Coulter's testimony bore upon its face such strong evidences of unreliability as to require its rejection. The facts relied on and pointed out by the plaintiff in error were presented to the jury. They had the right to pass upon his credibility in the light of the attending circumstances and the impeaching conflicts referred to by plaintiff in error, and we cannot say as a matter of law that they were not warranted in accepting his testimony as true. In his main charge the court restricted the damages which the plaintiff might recover to those sustained by reason of the loss of the sale of the goods to Eby. Upon that issue the court gave the following instruction: "If you believe from the evidence that the plaintiff H. W. Coulter was the owner of the goods, wares, and merchandise described in his petition on or about the 1st and 2d days of May, 1907, and on those days or either of them he delivered said goods to the defendant Gulf, Colorado & Santa Fé Railway Company, or to its station agent at Ft. Worth, Tex., and the same were received by said agent for transportation from Ft. Worth, in the state of Texas, to Philadelphia, in Pennsylvania; and if you further believe from the evidence that at the time of delivery of said goods to defendant the plaintiff directed the defendant's said station agent to route and waybill said goods from Ft. Worth to St. Louis, thence over the Vandalia line to Philadelphia by way of Indianapolis; and if you further believe from the evidence that the plaintiff at the time gave notice to or informed the said agent that he had conditionally sold the said goods to one Grant H. Eby for the sum of $7,000, to whom they were to be delivered at Indianapolis, or diverted there to Detroit, Mich., and if you further believe from the evidence that the said station agent agreed with plaintiff and promised him to so ship, route, and waybill said goods, and that, after said goods were loaded into the cars, the said agent issued a bill of lading to the defendant, which showed the goods were to be shipped from Ft. Worth to Philadelphia, but did not show they were to go to St. Louis, and thence over the Vandalia line by way of Indianapolis, with the privilege of diverting at Indianapolis to Detroit; and if you believe from the evidence that the plaintiff objected to said bill of lading because it did not show the routing by way of St. Louis over the Vandalia line to Indianapolis, and that after the same was is-

sued and delivered to the plaintiff, and his objections were stated thereto as aforesaid, the said station agent told the plaintiff that it was unnecessary to place the requested routing in the bill of lading, but that he would write in the waybill, and agreed and promised so to do, after the issuance and delivery of said bill of lading to plaintiff; and if you further believe from the evidence that there was no consideration for said bill of lading as to which I will instruct you later in this charge, or if you believe there was a consideration therefor, but that after it was delivered to plaintiff the said station agent agreed and promised the plaintiff to route and waybill his goods by way of St. Louis and Indianapolis over the Vandalia line with privilege of diverting at Indianapolis to Detroit; and if you further believe that the said goods were properly crated and boxed and properly loaded in the cars; and if you further believe that said goods were not routed or waybilled by way of St. Louis, and thence over the Vandalia line to Indianapolis with privilege of diverting from that place to Detroit, but was routed and waybilled from Ft. Worth to Chicago or Stony Point, thence over the 'Nickle Plate' road to Buffalo, N. Y., thence over the Lehigh Valley Road to or near Bethlehem, Pa., and thence over the Philadelphia & Reading Railroad to Philadelphia; and if you further believe that said goods were materially and seriously injured and damaged during said shipment on any of said railroads, so that the said Grant H. Eby for that reason in good faith refused to accept the same and pay the plaintiff therefor, as he had agreed with plaintiff to do, if you believe he did so agree; and you further believe from the evidence that if said goods had been shipped, routed, and waybilled by way of Indianapolis as directed by the plaintiff, if he did so direct them routed and waybilled, the said Eby would have accepted the same and paid the plaintiff therefor in money and notes to the amount of $7,000, to the plaintiff's satisfaction; and if you further believe from the evidence that by reason of the failure on the part of said station agent to route and waybill the same by way of St. Louis and Indianapolis, over the Vandalia line, the plaintiff lost the benefit of said sale to said Eby, if any had been made, and that said Eby refused by reason thereof to accept said goods and complete said sale, or refused to accept them by reason of their damaged condition, if they were damaged, or refused to receive them at Philadelphia instead of Indianapolis or Detroit, and that by reason of said refusal to accept said goods and pay him for same the plaintiff sold the same in Philadelphia for as much as he could in their damaged condition, if they were damaged—then I instruct you that the defendant by reason of its agent failing to route and waybill said goods by way of Indianapolis with the right to divert them to

Detroit from that place, if its agents had agreed so to do, became an insurer of said goods, and was and is liable to plaintiff for all the damages he has sustained by reason of such failure to route the goods as directed or agreed on, and, if you so believe, you should find for the plaintiff such damages as you believe from the evidence he has sustained. If you do not so believe as above instructed, you will find for defendant." Several objections are urged to this charge, among which are the following: That there is no evidence that Eby refused to receive the goods because they were sent to Philadelphia, instead of to Indianapolis or Detroit, or that he refused to receive them on account of their having been misrouted. Hence, it is contended, the charge was erroneous in submitting either of those issues to the jury. It is also objected that the charge makes the defendant liable for the difference between $7,000, the price Coulter testified Eby was to pay for the goods, and $1,200, the price at which they were sold after their arrival at Philadelphia. It is urged that this portion of the charge was submitting an improper measure of the damages. This last objection will be considered in discussing the next assignment. We think the charge of the court is subject to the first objections mentioned.

[2] The testimony of both Coulter and Eby shows that the latter refused the goods solely because of their damaged condition; that he agreed, notwithstanding their having been misrouted and carried to Philadelphia instead of being delivered at Indianapolis, to receive them, provided they could be repaired and put in proper condition by the 1st of the succeeding August; that Coulter's inability to have this done was the reason why the trade with Eby was abandoned.

[3] On the measure of damages the court gave the following instruction: "The measure of damages in this case, as presented now to the court and jury by the plaintiff's counsel, is the amount of money plaintiff had sold the goods for to said Eby, if he had sold them, with interest thereon at the rate of 6 per centum per annum from the 28th day of June, 1907, to the date plaintiff sold the goods in Philadelphia for $1,200, from which deduct the said $1,200 received by him therefor, and give interest at the rate of 6 per centum per annum on the balance to this date." A reference to the verdict of the jury shows that this instruction was literally obeyed, their finding being for plaintiff in the sum of $5,800, with interest at 6 per cent. per annum from the date of the arrival of the goods at Philadelphia, June 26, 1907. Assuming that Coulter had a contract with Eby for the sale of the goods, that he had given sufficient notice to the plaintiff in error's agents at Ft. Worth at the time of the shipment to charge the plaintiff in error with liability for such special damages as might result from the loss of his contract with Eby, and assuming, further, that the

goods arrived at their destination in a damaged condition due to the fault of the carrier, and that by reason of that fact the sale to Eby was lost, the measure of the defendant in error's damages would be the injury he sustained by reason of the loss of that contract of sale. In other words, his damages would be the difference between the value of his goods in their damaged condition at the time they reached Philadelphia and the value of his contract with Eby. Deming v. Railway Co., 48 N. H. 455, 2 Am. Rep. 267; St. L., I. M. Ry. Co. v. Mudford, 48 Ark. 502, 3 S. W. 814; 3 Hutch. on Carriers, § 1367. Had the contract with Eby contemplated a full cash payment upon delivery, then necessarily that sum would be taken as the basis from which to estimate the loss sustained. But if, as the evidence shows the facts to be, a part only of that price was to be paid in cash and the remainder in future installments, without any evidence as to Eby's solvency or the cash value of his contract or the rate of interest which the deferred payments were to bear, a different situation is produced. Coulter was entitled to recover just what he lost by the fault of the carrier. Inasmuch as compensation is to be made by the payment of a sum of money in cash, logically it would seem to follow that the value of the goods in their damaged condition and the purchase price agreed to be paid by Eby must be estimated upon a cash basis. Eby's contract was only one to purchase at a particular price, and its loss was merely the loss of the opportunity to sell at that particular price. The rule for estimating the damages that might be recovered would not be different had this loss been occasioned by a negligent delay on the part of the carrier, and in principle is similar to that which is adopted for measuring damages where through the negligence of the carrier the shipper has been deprived of the opportunity to sell stock or grain upon a particular market. In such instances it is held that the shipper may recover the difference between the market price of which he had been wrongfully deprived and that which he was compelled to take. Ft. Worth, etc., Ry. Co. v. Greathouse, 82 Tex. 104, 17 S. W. 834.

[4] In seeking to recover damages sustained by the loss of a market, it devolves upon the plaintiff, as part of the general burden assumed in making out his case, to allege and prove the value of the market lost. This may usually be done by proving the market quotations, or, in case of a particular offer, the amount of the price offered. We know of no adjudicated case in which these quotations or prices when so used contemplated other than cash transactions. Here the evidence affirmatively shows that the sale was not to be entirely for cash; that the greater part of the price was to be paid in future installments. Keeping in view the fact that Coulter was seeking a cash compensation, and the necessity of estimating both the value of the goods left on his hands and the price offered by Eby upon a cash basis, the question is, Did the court have the right to assume as a matter of law that the promise of Eby to pay $7,000 in the manner shown in the record was worth that sum in cash at the time the defendant in error was entitled to demand compensation?

[5] The defendant in error contends that we should indulge the presumption that the notes when executed were to bear interest at the rate of at least 6 per cent. per annum from date, would be secured by a lien upon the goods, and for that reason would prima facie be worth their face value. The propriety of presuming a fact is generally dependent upon the warrant for inferring that such a fact is the ordinary result of normal conditions existing under a given state of facts, or is the usual and rational course of conduct which people of ordinary discretion commonly adopt under the given circumstances. In sales of personal property for a consideration to be paid in the future, as was contemplated in this instance, the transaction involves the taking of a risk, more or less hazardous, for which compensation is usually provided either in the rate of interest to be paid, or by an increase in the principal sum beyond what might be deemed a cash value. It cannot be assumed as a matter of law that people of ordinary discretion placed in the situation occupied by Coulter and Eby would have contemplated the execution of notes secured by a lien on the property and bearing a rate of interest sufficient to make them commercially worth their face value. It may be that compensation for the extension of credit to Eby was included in the price agreed upon, and that the debt was to be discharged by the payment of the monthly installments of $75 without interest. If such had not been the intention of the parties, it was a matter easily proven. In the absence of a contract to the contrary, the law does not imply a promise to pay interest till after the maturity of the obligation. If this debt was not to bear interest till after maturity of the different installments, then the inference is irresistible that Eby's obligation to pay the $4,000 in future installments was worth less than its face value, and the court erred to the prejudice of the plaintiff in error in giving the charge complained of.

[6] This charge also assumed that $1,200 was the value of the goods when delivered to Coulter at Philadelphia June 27, 1907. It cannot be said that the testimony upon this issue justified such an assumption. It is true that this is the price at which the goods were sold, but the sale occurred more than a year after they reached Philadelphia. There was testimony as to what the goods were worth uninjured, and also evidence from which the jury might have concluded that the injury was not serious. As before stated, if when the goods arrived at Philadelphia they were damaged by the carrier's

fault, and Coulter's version be accepted as true, then he was entitled to recover the difference between the value of the goods in their damaged condition at that time and the value in cash of the sale which he had lost. We do not think the court was warranted in taking from the jury the issue as to the value of the goods in their damaged condition.

Quite a number of objections are urged to the admission of testimony. To notice these in detail would only involve the consideration of legal propositions too well settled to require discussion.

[7] The court should not have permitted Coulter to testify, over plaintiff in error's objection, as to his conversations with Eby, except as to so much as was essential to show the consummation of their contract and the rejection by Eby of the goods after their arrival at Philadelphia. It was also improper for the court to permit Coulter to reproduce statements made to him by Eby regarding the damaged condition of the goods. It appears from plaintiff in error's bill of exception that the court, over objection, permitted Coulter to take a wide range in testifying to conversations between himself and various other parties with whom he came in contact in his search for his goods and in his efforts to dispose of them.

[8] Many of these statements, in view of the issue to which the case was narrowed, would be practically harmless; some of them, however, cannot be so classed. Those which involve criticisms upon the condition of the goods and statements with reference to the manner in which the goods were routed were clearly irrelevant and immaterial, and should not have been permitted. The rules governing the admission of such evidence are so elementary that we do not consider it necessary to notice those assignments further. We merely direct attention to them in order that similar errors may be averted upon another trial.

Inasmuch as the case is to be reversed, it is proper to notice the objection embraced in the plaintiff in error's twenty-third and twenty-fourth assignments of error, complaining of the action of the court in permitting Coulter to testify as to the value of the goods when new and in an uninjured condition at Philadelphia and Indianapolis.

[9] It was developed on cross-examination that this witness while saying that he knew such values obtained his sole information from a salesman handling such goods. We do not think the source and extent of Coulter's information qualified him to give to the jury an opinion as to the values about which he was interrogated. S. P. Ry. Co. v. Maddox, 75 Tex. 300, 12 S. W. 815.

We have discussed only those errors which we think justify a reversal of the judgment and which may likely occur upon another trial.

The judgment of the district court is reversed, and the cause remanded for a new trial.